BLASER FARMS, INC., an Oklahoma corporation,
Plaintiff–Appellant/Cross–Appellee,

v.

ANADARKO PETROLEUM CORPORATION and Internorth, Inc. a/k/a Enron Corporation, Defendants–Appellees/Cross–Appellants.

Nos. 87–2420, 87–2474.

United States Court of Appeals, Tenth Circuit.

Jan. 4, 1990.

Gordon H. Rowe III of Gist, Grimes & Gelders, Oklahoma City, Okl. (John B. Gelders of Gist, Grimes & Gelders, Oklahoma City, Okl., and Bryan L. Wright of Wright, Dale & Jett, Guymon, Okl., with him on the briefs), for plaintiff-appellant/cross-appellee.

Gary W. Davis (L. Mark Walker and J. Clay Christensen with him on the briefs) of Crowe & Dunlevy, Oklahoma City, Okl., for defendants-appellees/cross-appellants.

Before McKAY, SETH and BRORBY, Circuit Judges.

McKAY, Circuit Judge.

This is an appeal from a ruling in favor of defendants-appellees on their motion for summary judgment.

## I.

This diversity action by plaintiff-appellant Blaser Farms, Inc. ("Blaser") against defendants-appellees Anadarko Petroleum Corporation and ENRON Corporation (collectively "Anadarko") involves the construction of the terms of an oil and gas lease.[1] Anadarko is the successor-in-interest to an oil and gas lease covering the minerals underlying a quarter section of property in Texas County, Oklahoma. Blaser's predecessors-in-interest, Mary Ellen and Ralph M. Smith, executed the lease in favor of Prince Petroleum on July 31, 1981. The lease states that it "shall remain in force for a term ending July 31, 1984 and as long thereafter as oil, gas, casinghead gas, casinghead gasoline or any of them is produced." On October 14, 1982, within the primary term of the lease, Anadarko completed a well on the leased property that was capable of producing gas in commercial quantities. The total cost of the drilling and completion of the well amounted to approximately $299,094.00.

---

1. Blaser commenced this action to quiet title asserting the following: the lease in question terminated on October 14, 1985; the lease constitutes a cloud upon the title; the production of hydrocarbon from the well after the lease terminated resulted in Anadarko being a trespasser; and the remedy sought was the recovery of actual and punitive damages.

Anadarko was unable to market the gas immediately, however, so it kept the well "shut in" until approximately December 7, 1985, at which time Anadarko connected the well to a gas pipeline and produced gas. Because the well was completed and shut in, Anadarko was required to pay certain "substitute royalties" pursuant to paragraph 26 of the Addendum to the lease which provides:

Notwithstanding anything in this lease to the contrary, it is expressly agreed that if the Lessee shall commence drilling operations within the primary term of this lease or upon a consolidated gas unit of which this lease is a part and shall complete a well capable of producing gas in paying quantities, this lease shall remain in force and its term shall continue only in the event either (a) pipeline connections are made within one (1) year from the date the well is completed and shut-in; or (b) in the event pipeline connections have not been made within said one (1) year period, then the Lessee shall pay or tender to the Lessor a royalty being referred to as substitute royalty in the amount of $3.00 per acre, per year; or (c) if pipeline connections are not made within two (2) years from date the well is shut-in, then the Lessee shall pay or tender to the Lessor a royalty hereafter referred to as substitute royalty in the amount of $5.00 per acre, per year. Said substitute royalties may be paid directly to the Lessor at his last known mailing address or made to the Lessor's credit in the United Bank, Fort Collins, Colorado. The payment of said substitute royalties as just provided shall continue said lease; said lease shall be in full force and effect as if said well had been completed and connected to a pipeline and producing within the primary term as hereinbefore mentioned.

In September 1983, Anadarko tendered royalties in the amount of $480.00 to Blaser's predecessors-in-interest, which were accepted. In September 1984, Anadarko tendered royalties in the amount of $800.00 to Blaser, which were also accepted. On or about January 7, 1986, Anadarko tendered royalties in the amount of $800.00, but Blaser refused to accept them.

Blaser filed its action on July 17, 1986, claiming that the lease had automatically terminated. Blaser argued that the "shut-in" provision quoted above operated as a special limitation and that the limitation must be construed such that substitute royalties were due at or before the beginning of the periods to which they applied. Thus Anadarko's January 1986 tender of substitute royalties covering the period from October 14, 1985, through October 14, 1986, was untimely, and the lease automatically terminated in October 1985.

Anadarko argued in response that because the shut-in provision did not expressly state a date on which the substitute royalties were due, the provision was ambiguous. Given this ambiguity, Anadarko claimed that the provision must be construed to mean that the substitute royalties were not due until the end of the periods to which they applied. Thus, under the interpretation urged by Anadarko, the tender made on January 7, 1986, to cover the 1985–86 period was within a reasonable time after the well completion date.

After the parties filed cross-motions for summary judgment, the trial court entered summary judgment in favor of Anadarko. The court interpreted the shut-in provision as a special limitation that normally would cause the lease to terminate if the lessee failed to pay substitute royalties during any period in which the well was shut in. Given the nature of the special limitation, the court concluded that there was no ambiguity as to the royalty due date and that the royalties were due at or before the beginning of the periods to which they applied. Thus, the royalty payments at issue here were due on or before the well's anniversary date of October 14 each year, and each annual royalty payment applied to the year following the due date. Consequently, the court concluded that Anadarko's tender of January 7, 1986, was not timely.

The court went on to conclude, however, that under Oklahoma law "compelling equitable considerations" may prevent an otherwise determinable leasehold from caus-

ing "the harsh result of forfeiture." Order, May 7, 1987, at 22–23. The court noted that Anadarko had successfully connected the well to a pipeline in December 1985 (a delay of less than three months) and had incurred costs amounting to nearly $300,000. Because of the existence of these equitable circumstances, the court concluded that, as a matter of law, it "must . . . refuse to give literal effect to the special limitation contained in the shut-in gas royalty clause." *Id.* at 22. Accordingly, the court entered its order granting Anadarko's motion for summary judgment and denying Blaser's cross-motion.

## II.

We note at the outset that in reviewing a summary judgment order, "the appellate court applies the same standard employed by the trial court under Rule 56(c) of the Federal Rules of Civil Procedure." *Osgood v. State Farm Mut. Auto Ins. Co.*, 848 F.2d 141, 143 (10th Cir.1988). Under Rule 56(c), summary judgment "shall be rendered forthwith if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, it is our duty to examine the record to determine first whether any genuine issue of material fact existed. If not, then we must determine whether the trial court correctly applied the substantive law in concluding that Anadarko was entitled to judgment as a matter of law. *See Osgood*, 848 F.2d at 143. For reasons stated below, we conclude that the district court correctly entered summary judgment in favor of Anadarko.

## III.

Anadarko argues that the district court erred in its conclusion that paragraph 26 operated as a special limitation instead of a contractual covenant or condition. In support of its contention, Anadarko cites *Gard v. Kaiser*, 582 P.2d 1311 (Okla.1978). In *Gard*, the Supreme Court of Oklahoma examined the language of a gas shut-in provision similar to that contained in paragraph

26 quoted above. The provision involved in *Gard* stated:

> During any period . . . when gas is not being so sold or used and the well or wells are shut in and there is no current production of oil or operations . . . lessee shall pay . . . a royalty of One Dollar ($1.00) per year. . . . When such payment . . . is made it will be considered that gas is being produced within the meaning of the entire lease.

*Id.* at 1312. The court then relied heavily on Merrill, *Use and Proper Drafting of Shut-In Royalty Clauses*, 43 Okla.B.J. 2247 (1972), which states: "In no way at all does [a shut-in provision] operate to set a specific date for the termination of the lease. If that is to be achieved, it must be through the addition of very carefully prepared, very explicit language." *Id.* at 2252. Following the position of the quoted article, the *Gard* court went on to conclude that the shut-in provision in the lease failed to create a special limitation because it did not explicitly do so. *See Gard*, 582 P.2d at 1314–15.

■ Despite the reasoning followed in *Gard*, we agree with the district court's conclusion that paragraph 26 reads like a special limitation. Specifically, the district court correctly interpreted the language of paragraph 26 which states that "this lease shall remain in force and its term shall continue *only in the event either* (a) . . .; (b) . . .; or (c). . . ." (emphasis added). This language, unlike the language involved in *Gard*, makes clear that the shut-in provision was intended by its drafter to operate like a special limitation. Only through the existence of one of the three limiting events could the lease continue in force. Thus, no genuine issue existed regarding the meaning of paragraph 26. Although this language satisfies the traditional common-law language of special limitations in leases, the trial court held, and we note hereafter, that under Oklahoma law such provisions do not operate exactly like common-law defeasible estates. Oklahoma permits the application of ameliorating equitable considerations in these substitute royalty cases notwithstanding their facial similarity to defeasible estates created

by special limitation language. *See infra* section V.

## IV.

■ Anadarko argues further that the district court erred in interpreting paragraph 26 as requiring the substitute royalties to be paid in advance of the periods to which they applied. Indeed, the provision fails expressly to state a date upon which the royalties are due. Anadarko's conduct, however, contradicts the interpretation Anadarko urges. Anadarko tendered its first two royalty payments in September of 1983 and September of 1984. Both payments were made in advance of the periods to which they applied. Moreover, given the shut-in provision's nature as something similar to a special limitation, it is likely that the payments were meant to be due in advance. We therefore conclude that the district court correctly interpreted the provision to require the royalty payments in advance.

## V.

■ We now consider whether the district court correctly applied the law to the facts discussed above. Because this is a suit based on diversity of citizenship, we must apply the law of the forum state, in this case Oklahoma. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Lowell Staats Mining Co. v. Pioneer Uravan, Inc.*, 878 F.2d 1259, 1262 (10th Cir.1989).

As stated above, Anadarko made its third royalty payment on approximately January 7, 1986—nearly three months after the well anniversary date of October 14, 1985. Because the district court concluded that paragraph 26 was a special limitation, Blaser argues that the court incorrectly applied Oklahoma law when it concluded that the lease did not automatically terminate when Anadarko failed to tender royalties on or before October 14, 1985.

In support of its contention, Blaser relies extensively on the writings of Professor Eugene Kuntz. With respect to shut-in royalty provisions, Professor Kuntz states that where a shut-in provision is a special limitation, "a failure to make the required shut-in gas royalty payments will result in the automatic termination of the lease if the lease is not held pursuant to the provisions of another clause in the lease." 4 *E. Kuntz, The Law of Oil and Gas* § 46.5(b) (1972). Prior to 1979, the Supreme Court of Oklahoma applied this rule in a number of cases dealing with lease provisions similar to the one at issue here. *See, e.g., Ellison v. Skelly Oil Co.*, 206 Okl. 496, 244 P.2d 832, 835 (Okla.1951); *Eastern Oil Co. v. Smith*, 80 Okl. 207, 195 P. 773, 775 (1920). The traditional view states further that when the limiting event occurs, the lease terminates and "equity has nothing whatever to do with the matter." 3 *E. Kuntz, The Law of Oil and Gas* § 36.3 (1989). Blaser argues, therefore, that the district court erred when it concluded that "compelling equitable considerations mandate that [Anadarko] be relieved of the harsh result of forfeiture." Order, May 7, 1987, at 23.

Despite Blaser's argument, we hold that the district court properly interpreted Oklahoma law as allowing equitable considerations to prevent forfeitures in cases such as this. The Supreme Court of Oklahoma has stated clearly that lease clauses like paragraph 26, although traditionally construed as special limitations, do not automatically terminate leases when such terminations would cause harsh forfeitures. *See Barby v. Singer*, 648 P.2d 14, 17 (Okla.1982); *Stewart v. Amerada Hess Corp.*, 604 P.2d 854, 858 (Okla.1979). In *Stewart*, the Supreme Court of Oklahoma considered the question of whether a so-called "thereafter" clause [2] operated to terminate a lease when the well in question ceased to produce in paying quantities. *See Stewart*, 604 P.2d at 856–57. Although such clauses

---

**2.** Under the typical "thereafter" clause, a lease remains in force for an initial term of years (referred to as the "primary term") and for so long thereafter as oil or gas is produced in paying quantities. *See 2 E. Kuntz, The Law of Oil and Gas* § 26.4 (1989).

are usually interpreted as special limitations,[3] the court held that the lease did not automatically terminate, stating:

> Under a literal or strict interpretation of the "thereafter" provision in a habendum clause, uninterrupted production—following expiration of primary term—would be indispensable to maintain a lease in force. This would mean that *any cessation* of production ..., however slight or short, would put an end to the lease. Oklahoma has rejected that literal a view. Our law is firmly settled that the result in each case must depend upon the circumstances that surround cessation. Our view is no doubt influenced in part by the strong policy of our statutory law against forfeiture of estates. The terms of 23 O.S.1971 § 2 clearly mandate that courts avoid the effect of forfeiture by giving due consideration to compelling equitable circumstances.

*Id.* at 858 (emphasis in original).

We recognize that the provision at issue here is distinguishable from the "thereafter" clause involved in *Stewart.* Indeed, the provision in paragraph 26 is a "shut-in royalty clause" that allows the lessee to keep the lease in force by paying royalties instead of producing oil or gas. To the extent that both types of provisions contain language similar to special limitations, however, we believe the Supreme Court of Oklahoma would apply the *Stewart* rationale equally to both types of clauses.

We hold that the district court properly applied Oklahoma law in concluding that equitable circumstances prevented the automatic termination of the lease. The district court was therefore correct in awarding judgment as a matter of law. We AFFIRM.

---

3. We recognize the apparent inconsistency in the district court's conclusions. On the one hand, the court concluded that the provision was a special limitation, while on the other hand, it concluded that the occurrence of the limiting event (failure to pay substitute royalties by October 14, 1985) did not automatically terminate the lease. However, we do not read the district court's order as concluding that the provision was a common-law determinable estate in property. Rather, the court properly treated the provision the same way the Supreme Court of Oklahoma would—like a contract provision that merely bore some resemblance to a determinable estate. That Oklahoma treats oil and gas leases as contracts rather than estates in property is evidenced by the Supreme Court's statement that: "The 'thereafter' clause is hence not ever to be regarded as akin in effect to the common-law conditional limitation or determinable fee estate. The occurrence of the limiting event or condition does not automatically effect and end to the right." *Stewart,* 604 P.2d at 858.